A09A0086. THE STATE v. MILLER.

(680 SE2d 627)

PHIPPS, Judge.

The state appeals an order of the Superior Court of Gwinnett County dismissing two counts of a five-count indictment against Omar Miller based on the state's destruction of potentially exculpatory evidence. Initially, the court announced that it would give the jury a remedial instruction on spoliation of evidence rather than grant Miller's motion to dismiss, because it did not appear that the state had acted in bad faith in destroying the evidence. Upon concluding, however, that such an instruction is not available in a criminal case, the court upon reconsideration found that the state had acted in bad faith and entered the order appealed.

The question of whether the trial court was authorized to grant the motion to dismiss, as a device to remedy a constitutional violation, is controlled by the decisions of the United States Supreme Court in *California v. Trombetta*[1] and *Arizona v. Youngblood.*[2] For reasons that follow, we hold that the trial court's grant of the motion to dismiss was authorized by these decisions and thus affirm.

*Facts*

Evidence introduced at the hearing on the motion showed that on November 22, 2007, a Gwinnett County police officer stopped a vehicle being operated by Miller because of a tag violation. Upon learning that there were outstanding warrants for Miller's arrest on charges that he had committed a simple battery on September 9,

---

[1] 467 U. S. 479 (104 SC 2528, 81 LE2d 413) (1984).
[2] 488 U. S. 51 (109 SC 333, 102 LE2d 281) (1988).

2007, a robbery and battery on October 5, 2007, and another battery and simple battery on September 28, 2007, the officer arrested Miller and incarcerated him in the Gwinnett County Detention Center. The officer also seized Miller's cell phone for use as evidence at trial, apparently because a picture of a gun was displayed on the screen saver and the officer thought Miller had been charged with armed robbery. The property sheet filled out by the officer, however, stated that the cell phone could be released to Miller. Moreover, the property sheet referenced only the traffic case against Miller and not the other criminal charges. And Miller's residential address, as written down by the officer on the property sheet, was incorrect.

Apparently, the tag violation against Miller was resolved; and the police department sent a notice dated December 19, 2007, informing Miller that it had property in its custody that would be disposed of within 90 days if he did not retrieve it. But the notice was sent to the address on the property sheet, rather than to Miller's correct permanent address or to the Gwinnett County Detention Center where he remained in custody. As a result, the notice was returned to the police department with the notation "insufficient address, unable to forward."

The preliminary hearing was scheduled for December 5, 2007, by which time counsel had been appointed to represent Miller. Miller informed counsel that his cell phone contained contact information for two witnesses who could provide Miller with an alibi on October 5, 2007, as well as a third witness who possessed information concerning the victim named in the indictment (Damika Wright) that corroborated Miller's defense.

On January 29, 2008, however, the Gwinnett County Police Department submitted an application pursuant to OCGA § 17-5-54 for destruction of multiple items of personal property in the custody of the department in a number of cases. One of the listed cases was the traffic case against Miller, and one of the items of personal property was his cell phone. As required by OCGA § 17-5-54 (a), the application (and an attached, sworn verification of the chief of police) stated that the items of property to be destroyed had been "unclaimed for more than ninety (90) days after their seizure, or following the final conviction in the case of property used as evidence, and such items [were] no longer needed in a criminal investigation or for evidentiary purposes." Insofar as concerned Miller's cell phone, the above representations were false. Nonetheless, in reliance on them, the superior court signed an order on February 4, 2008, authorizing destruction of the property. And the cell phone was destroyed.

On February 20, 2008, Miller was indicted on one count of robbery and two counts each of battery and simple battery. At

Miller's arraignment on March 19, 2008, defense counsel informed the prosecuting attorney about the cell phone. Unaware of its destruction, defense counsel obtained the prosecutor's consent to release of the cell phone for use by the defense. After learning of the cell phone's destruction, the defense filed a motion to dismiss the indictment based on the state's destruction of exculpatory evidence.

## Trial Court's Rulings

After conducting a hearing, the court initially determined that the state had not destroyed the cell phone with knowledge of its potentially exculpatory nature and, therefore, the defense had not made a sufficient showing of bad faith by the state to justify dismissal of any of the charges, but rather the appropriate remedy would be an instruction to the jury at trial on spoliation of evidence. But shortly thereafter the court determined that such a jury instruction could be given only in civil cases.[3]

The court then entered an order concluding that because the police officer had seized the cell phone without any real justification, because the police department could have delivered the cell phone to Miller while he was being held in custody, because the police department had destroyed the cell phone in violation of OCGA § 17-5-54 and through representations in the application that were inaccurate, and because the police officer who seized the cell phone did not appear and testify at the hearing on Miller's motion to dismiss, acts amounting to conscious wrongdoing by the state had been shown so as to justify dismissal of the two charged offenses that allegedly occurred on October 5, 2007. In so ruling, the court also found that the cell phone contained Miller's only means of contacting the three exculpatory witnesses and that, because of the record-keeping practices of the cell phone provider, there were no call logs that could be subpoenaed. After giving the state an opportunity to present additional evidence, the court entered an order dismissing two of the five counts of the indictment.

## Trombetta/Youngblood

The defendants in *Trombetta* were charged with driving under the influence with unlawful blood-alcohol concentrations as shown

---

[3] See *Doyal v. State*, 287 Ga. App. 667, 672 (7) (653 SE2d 52) (2007) (jury instruction on spoliation of evidence under OCGA § 24-4-22 not appropriate in a criminal case); but compare *Morgan v. State*, 267 Ga. 203, 205-207 (3) (476 SE2d 747) (1996) (it is proper for counsel in a criminal case to ask jury to draw adverse inference of fact from failure to produce a witness whom the opposing party represents as having knowledge of material and relevant facts).

by the results of Intoxilyzer tests to which they had submitted. The defendants filed motions to suppress on the ground that the arresting officers' failure to preserve samples of the defendants' breath deprived them of the opportunity to impeach the breath test results. The California Court of Appeals reversed the trial court's denial of the defendants' motions to suppress, concluding that their due process rights had been violated by the state's failure to preserve the evidence.[4]

The United States Supreme Court began its analysis by observing "the difficulty of developing rules to deal with evidence destroyed through prosecutorial neglect or oversight. Whenever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed."[5]

Relying on its admittedly sparse precedent in the area, the Supreme Court held that the defendants' constitutional right to due process had not been violated, noting that law enforcement authorities had not destroyed their breath samples

> in a calculated effort to circumvent the disclosure requirements established by *Brady v. Maryland* and its progeny. In failing to preserve breath samples for [defendants], the officers here were acting in good faith and in accord with their normal practice. The record contains no allegation of official animus towards [defendants] or of a conscious effort to suppress exculpatory evidence.[6]

Ultimately, *Trombetta* concluded:

> Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.[7]

*Trombetta* found neither condition met because, although the pres-

---

[4] 467 U. S. at 483-484.
[5] Id. at 486 (citation omitted).
[6] Id. at 488 (citation and punctuation omitted).
[7] Id. at 488-489 (citation and footnote omitted).

ervation of breath samples might conceivably have contributed to the defendants' defense, the chances of the breath samples being exculpatory were extremely low, and the defendants had alternative means of challenging the accuracy of the test results.[8]

In sum, therefore, *Trombetta* began its analysis by referring to "potentially exculpatory evidence" and noting that in failing to preserve such evidence in that case the police had been acting in good faith in accord with their normal practice. The Court then shifted its emphasis to "evidence that might be expected to play a significant role in the suspect's defense," and held that for such evidence to satisfy its standard of "constitutional materiality," it must "possess an exculpatory value that was apparent" before it was destroyed and be of such nature that the defendant would be unable to obtain comparable evidence by other reasonably available means. Unclear from *Trombetta*, therefore, was the role of the good faith inquiry in the due process examination and what was meant by "apparent value" of exculpatory evidence.[9]

In *Youngblood*, police obtained semen samples from the clothing of a sexual assault victim. After conducting tests of the semen samples that were inconclusive as to the assailant's identity, the police failed to preserve the clothing for further testing. At trial, the defendant presented expert testimony that timely performance of other tests on samples from the clothing could have produced results that would have exonerated him. The Arizona Court of Appeals reversed the defendant's conviction, holding that " 'when identity is an issue at trial and the police permit the destruction of evidence that could eliminate the defendant as the perpetrator, such loss is material to the defense and is a denial of due process.' "[10]

The Supreme Court began its review of the Arizona court's decision by stating in a footnote that "[t]he presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed."[11] After noting in the footnote that *"Trombetta* speaks of evidence whose exculpatory value is 'apparent[,]' "[12] *Youngblood* indicated that the exculpatory value of the semen samples would not have been apparent to the police unless they "knew the [evidence] *would* have exculpated [the

---

[8] Id. at 489-490.

[9] See *Wisconsin v. Greenwold*, 525 NW2d 294 (Wisc. App. 1994); Note: The Role of Police Culpability in *Leon* and *Youngblood*, 76 Va. L. Rev. 1213 (1990).

[10] 488 U. S. at 54 (citations omitted).

[11] Id. at 56, n. * (citation omitted).

[12] Id.

defendant]" when it was lost or destroyed.[13] That, of course, creates a standard very difficult to meet. Later in the main text of the opinion, however, *Youngblood* indicated that bad faith can be shown in those cases in which the police knew that "the evidence *could* form a basis for exonerating the defendant."[14]

In the interim, the Court held:

> The Due Process Clause of the Fourteenth Amendment, as interpreted in *Brady*, makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence. But we think the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant.[15]

Ultimately, the Court concluded "that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law."[16] In support of its finding that bad faith had not been shown there, *Youngblood* further concluded that "[t]he failure of the police to [preserve] the clothing and to perform tests on the semen samples can at worst be described as negligent."[17]

, In interpreting the interaction between *Trombetta* and *Youngblood*, lower courts have taken divergent approaches and, because of the extreme difficulty of surmounting *Youngblood's* bad faith hurdle, a number of state courts have turned to their own laws in deciding whether the state's destruction or failure to preserve potentially exculpatory evidence warrants dismissal of criminal charges.[18]

### Application of Trombetta and Youngblood in Georgia

In our opinion, *Youngblood* describes three types of evidence: (1) that which the police knew "would have exculpated" the defendant, (2) that which the police knew "could have exculpated" the defendant, and (3) that of which nothing more can be said other than that

---

[13] Id. (emphasis supplied).
[14] Id. at 58 (emphasis supplied).
[15] Id. at 57.
[16] Id. at 58.
[17] Id.
[18] See The Youngblood Success Stories: Overcoming the "Bad Faith" Destruction of Evidence Standard, 109 W. Va. L. Rev. 421 (2007).

it is potentially useful evidence. *Youngblood* seems to treat the first type of evidence as "material exculpatory evidence" and to make good or bad faith irrelevant when the police destroy or fail to preserve such evidence.[19] As to the second and third types of evidence, *Youngblood* seems to require a showing of bad faith such as the type outlined in *Trombetta*, i.e., official animus toward the defendant or a conscious effort to suppress exculpatory evidence, before the state's destruction or failure to preserve such evidence rises to the level of a due process violation.[20] And before dismissal of criminal charges is warranted for destruction or failure to preserve any of the three types of evidence, it would seem that the *Trombetta* requirement, concerning the inability of the defendant to obtain comparable evidence by other reasonably available means, continues in effect. Consistent with this interpretation of *Youngblood* and *Trombetta*, Georgia cases have held as follows:

*Hannah v. State*[21] was a murder prosecution in which the defendant claimed that the victim had died from a drug overdose, rather than from having been battered by him. Pill bottles were found in the vicinity of the victim's body at the time of her death. The defendant complained that the state had violated his due process rights by failing to produce the pill bottles. *Hannah* found that the pill bottles were not material under the *Youngblood* line of cases and that the state was not chargeable with bad faith in failing to produce them, because the medical examiner testified about the drugs found in the victim's body and other testimony established the existence of the pill bottles.

In *Doyal v. State*,[22] there was no evidence that the police officers who had arrested the defendant for unlawful possession of drugs and drug related objects had acted in bad faith in following their routine policy of disposing of the objects without preserving fingerprints from them, after they had seen the defendant handling one of the objects.

In *Moten v. State*,[23] an armed robbery defendant failed to show

---

[19] 488 U. S. at 57 ("The Due Process Clause of the Fourteenth Amendment, as interpreted in *Brady*, makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence.").

[20] Id. at 58 ("We think that requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, i.e., those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant. We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.").

[21] 278 Ga. 195, 197-198 (3) (599 SE2d 177) (2004).

[22] Supra, 287 Ga. App. at 671 (6).

[23] 252 Ga. App. 222, 224-225 (5) (a) (554 SE2d 553) (2001).

that a police officer acted in bad faith or destroyed evidence that had any apparent exculpatory value, by leaning on and wiping a counter that previously had been dusted for fingerprints and found to contain only smudges.

In *Giraudy v. State*,[24] a law enforcement agent failed to preserve audiotapes of undercover drug buys after he had concluded from listening to them that they were inaudible. We held that the defendant failed to show either that the evidence was material or that the officer had acted in bad faith.

In *State v. Blackwell*,[25] however, the exculpatory value of the destroyed evidence was apparent where the evidence consisted of a urine sample which had been subjected to two tests for illegal drugs, one of which was negative. The state also acted in bad faith, because the urine sample was destroyed by the state crime lab without notice to the defendant, after the defendant had sought an independent analysis of the sample, after the trial court had entered an order permitting such analysis, after the crime lab was notified that the defendant wanted the sample, and after the state represented to the defendant that the sample was unavailable.[26]

## Our Conclusions

Here, the cell phone was erroneously seized as evidence of a robbery and battery allegedly committed by Miller on October 5, 2007. Because of the destruction of the cell phone, the trial court dismissed those charges against Miller, in essence because the cell phone contained information that could have led to Miller's acquisition of evidence that could have exculpated him. Under these circumstances, the cell phone is properly characterized as type two or three *Youngblood* evidence. The trial court found that the police had engaged in conscious wrongdoing and thus acted in bad faith in destroying the cell phone, based on the arresting officer's failure to testify in combination with other facts such as those showing that the police failed to return the cell phone to Miller even though they were obviously aware of his temporary abode, and that they made false statements under oath in obtaining permission to destroy the phone. This was a factual determination by the court that we do not find to be clearly erroneous.[27] And the evidence supports the court's finding that Miller could not obtain the information stored in the cell phone by other reasonably available means. The trial court was thus

---

[24] 252 Ga. App. 219, 220-221 (1) (555 SE2d 874) (2001).
[25] 245 Ga. App. 135, 137-141 (2) (b), (c) (537 SE2d 457) (2000).
[26] Id. at 141-142 (2) (d).
[27] See generally id. at 141 (2) (d).

authorized to find a denial of Miller's right to due process under the federal constitution and to order dismissal of the criminal charges because of the state's destruction of the cell phone.

*Judgment affirmed. Miller, C. J., Smith, P. J., and Barnes, J., concur. Andrews, P. J., Johnson, P. J., and Bernes, J., dissent.*

BERNES, Judge, dissenting.

Because Omar Miller failed to present any evidence that the state knew of the potentially exculpatory or useful nature of the cell phone at the time of its disposal — a critical element of bad faith — the trial court erred in granting his motion to dismiss. Accordingly, I respectfully dissent from the majority decision in this case.

When the state disposes of evidence potentially exculpatory or useful to a defendant, a due process violation is established only if the defendant carries his burden of showing that the state acted in bad faith. *Illinois v. Fisher*, 540 U. S. 544, 547-548 (124 SC 1200, 157 LE2d 1060) (2004) (per curiam). See *Arizona v. Youngblood*, 488 U. S. 51, 56-58 (109 SC 333, 102 LE2d 281) (1988); *California v. Trombetta*, 467 U. S. 479, 488 (II) (104 SC 2528, 81 LE2d 413) (1984); *Swanson v. State*, 248 Ga. App. 551 (1) (a) (545 SE2d 713) (2001). That the state acted negligently or handled the evidence in a manner indicating "careless, shoddy and unprofessional investigatory procedures" is insufficient to establish bad faith. *Walker v. State*, 264 Ga. 676, 681 (3) (449 SE2d 845) (1994). See *State v. Brawner*, 297 Ga. App. 817 (678 SE2d 503) (2009); *Jackson v. State*, 258 Ga. App. 806, 810 (3) (575 SE2d 713) (2002). Rather,

> the presence or absence of bad faith by the police for purposes of the Due Process Clause *must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed.* A finding of bad faith is reserved for those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant.

(Punctuation and footnotes omitted; emphasis supplied.) *State v. Blackwell*, 245 Ga. App. 135, 141 (2) (d) (537 SE2d 457) (2000) (whole court). See *Youngblood*, 488 U. S. at 56; *Brawner*, 297 Ga. App. at 819-820. Therefore, a due process violation is established only in the limited circumstance where the state made a deliberate effort to destroy evidence which it knew to be exculpatory, potentially exculpatory, or useful to the defendant. See *Trombetta*, 467 U. S. at 488 (II); *Walker*, 264 Ga. at 681 (3); *Brawner*, 297 Ga. App. at 819; *Doyal v. State*, 287 Ga. App. 667, 671 (6) (653 SE2d 52) (2007). Here, Miller presented no evidence of a due process violation as

defined under this standard. There was no evidence that the cell phone was exculpatory on its face. Moreover, no testimony was presented at the hearing which would indicate that the evidence custodian, arresting officer, or any other state official knew that the cell phone had any potentially exculpatory or useful value to Miller at the time of its disposal. Finally, because Miller did not call to the stand the state official who verified the OCGA § 17-5-54 application, the record was silent as to whether the official's inaccurate verification was the result of anything beyond mere negligence. Cf. *Davis v. State of Ga.*, 256 Ga. App. 299, 303 (1) (568 SE2d 161) (2002) (noting that in search warrant context, the veracity of the affiant can be successfully impeached only if the defendant alleges and produces evidence that an inaccurate or omitted statement in the affidavit was not simply the result of negligence or innocent mistake).

Given this record, the trial court erred in finding that Miller met his burden of proving bad faith and should not have dismissed the charges. See *Walker*, 264 Ga. at 680 (3); *Brawner*, 297 Ga. App. at 821; *Jackson*, 258 Ga. App. at 810 (3). See also *Henry v. Page*, 223 F3d 477, 480-481 (II) (7th Cir. 2000) (no due process violation where evidence custodian mistakenly destroyed evidence in response to civil forfeiture order before case had been completed). Compare *Blackwell*, 245 Ga. App. at 138-141 (2) (b)-(d) (bad faith established by the state's destruction of urine sample in a DUI case when the state had tested the sample and knew of its exculpatory value and destroyed the sample in violation of a court order granting the defendant access to it for independent testing). I am sympathetic to the trial court's concern that the state obtained an order authorizing the disposal of Miller's cell phone based upon an inaccurate verification provided to the court. Nevertheless, under the longstanding precedent of the United States Supreme Court and the appellate courts of this state, the burden was upon Miller to prove that state officials acted in bad faith, not simply negligently or carelessly. And the bad faith requirement serves the important purpose of "limit-[ing] the extent of the police's obligation to preserve evidence to reasonable bounds and confin[ing] it to that class of cases where the interests of justice most clearly require it." *Youngblood*, 488 U. S. at 58. In the absence of any evidence of the state's knowledge as to the potentially exculpatory or useful nature of the evidence, Miller failed to meet his burden of showing bad faith, necessitating reversal of the trial court.

I further question whether there was any evidence to support a finding of conscious wrongdoing. Significantly, the record establishes that Miller had previously resided at the address to which the notice was sent. Moreover, the incorrect verification stating that Miller's property had been unclaimed for more than 90 days was contained in

an omnibus application, which listed over 600 items of personal property from a multitude of cases, and did not in and of itself establish official animus toward Miller. Finally, contrary to the trial court's ruling, the state's failure to call the arresting officer in the traffic case to testify at the pretrial hearing in the robbery and battery case does not evidence bad faith. The record reflects that the state did not receive Miller's motion to dismiss until the day set for trial, and that the arresting officer was not available to testify at the ensuing hearing because he was on leave in California and the state had not planned on calling him as a witness at trial. In any event, the burden was on Miller to affirmatively prove bad faith, not on the state to prove its absence, and so the state had no obligation to call the officer.

Because the record in this case does not authorize a finding of bad faith, I believe that the trial court's decision was erroneous.

I am authorized to state that Presiding Judge Andrews and Presiding Judge Johnson join in this dissent.

DECIDED JUNE 29, 2009 ▮

*Daniel J. Porter, District Attorney, William C. Akins, Assistant District Attorney*, for appellant.

*Jack E. Harrell, Jr., Sharon L. Hopkins*, for appellee.